Cite as 2021 Ark. 78

# SUPREME COURT OF ARKANSAS

**No.** CR–20–245

|  |  |
|---|---|
| | **Opinion Delivered:** April 15, 2021 |
| TIMOTHY JUSTIN JOYNER<br>APPELLANT | APPEAL FROM THE STONE COUNTY CIRCUIT COURT [NO. 69CR-06-64] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE TIM WEAVER, JUDGE |
| | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On December 13, 2007, a Stone County Circuit Court jury convicted appellant, Timothy Justin Joyner, of four counts of rape and one count of terroristic threatening. Joyner was sentenced to forty years on each count of rape and six years on the count of terroristic threatening, all to run concurrently. We affirmed his convictions and sentences in *Joyner v. State*, 2009 Ark. 168, at 1, 303 S.W.3d 54, 55. Joyner was convicted of raping his girlfriend's daughter, S.O. The relevant facts as we recounted in Joyner's direct appeal are as follows:

> On May 17, 2006, an information was filed charging Appellant with four counts of rape, each of which was a class "Y" felony in violation of Arkansas Code Annotated § 5-14-103. Each count charged him with unlawfully and feloniously engaging in sexual intercourse or deviate sexual activity with S.O., who was less than fourteen years of age.

> On April 25 and December 13, 2007, Appellant filed motions to admit evidence of prior sexual conduct of S.O., specifically evidence that she had

made prior allegations of sexual assault against other males in a familial relationship. Appellant alleged that S.O. was the victim of two prior sexual assaults. He claimed that the evidence of two prior sexual assaults could be the cause of injury to S.O.'s vaginal area. The two alleged incidents involved a man named Lavelle in 2000 and a man named Chuck McGhee in 2001.

On December 17, 2007, the Stone County Circuit Court held an in camera hearing on the rape-shield motion. Appellant called Tammy Mosley, the mother of S.O.'s best friend, D.D., who testified that she had knowledge of previous sexual abuse of S.O. Appellant also presented an affidavit of Tammy stating that she had "first-hand knowledge of the molestation of [S.O.] by Mr. [McGhee] in 2001" and that "[S.O.] was not a virgin when she accused [Appellant] of rape." Appellant also offered the affidavit of D.D., Tammy's daughter. The affidavit was excluded on hearsay grounds, but was proffered into the record. D.D.'s affidavit stated that both she and S.O. were touched in their private areas by Lavelle, that S.O. was molested many times in 2000 and 2001, and that S.O. was not a virgin when she accused Appellant of rape. It was reported to Human Services that S.O.'s mother walked in on Chuck McGhee having sex with S.O. After the testimony of Tammy and D.D., Appellant asked to call S.O. to testify in the in camera hearing.

Relying on *Sterling v. State*, 267 Ark. 208, 590 S.W.2d 254 (1979), the circuit court ruled that there is no requirement for S.O. to present herself for questioning by the accused and denied Appellant's request to call S.O. to the stand. The circuit court ruled that Appellant did not offer proof that the alleged prior act occurred and that the rape-shield statute precluded any inquiry into the prior sexual conduct of S.O.

On the first day of trial, Jennifer Beaty, the DNA analyst from the Arkansas Crime Lab, testified that DNA found on a pair of S.O.'s underwear belonged to S.O. within a reasonable degree of scientific certainty. At the beginning of Appellant's cross-examination of Beaty, he moved for a mistrial on the grounds that she had changed her opinion and that he would not be able to effectively cross-examine her due to the sudden change in her opinion. The circuit court denied the motion for mistrial on the basis that it was not timely made and because all of the materials from Beaty's file had been supplied to Appellant.

On December 20, 2007, Appellant moved for a new trial pursuant to Arkansas Code Annotated section 16-89-130 and Arkansas Rule of Criminal Procedure 33.3(a), arguing again that he never received notice of Beaty's changed opinion. The circuit court reaffirmed its previous ruling that the motion for mistrial was not timely and denied Appellant's motion for new trial.

*Joyner*, 2009 Ark. 168, at 1–4, 303 S.W.3d 54, 55–56 (alterations in original).

On February 1, 2010, Joyner timely filed his original Rule 37 petition alleging five grounds for relief. On December 21, 2011, Joyner filed a motion for expanded Rule 37 petition. On October 13, 2015, the circuit court denied the motion for expanded petition. On February 24, 2017, Joyner filed a motion for leave to amend Rule 37 petition and attached his proposed amended petition, which had six grounds for relief. The State responded, filed a motion to dismiss based on delay and failure to prosecute, and filed a motion to strike Joyner's amended petition, and Joyner replied. The circuit court denied the State's motion to strike and allowed the amended petition. On May 23, 2019, the circuit court held a Rule 37 hearing. On February 6, 2020, the circuit court denied Joyner's petition.

Joyner now brings this timely appeal and presents five points on appeal: (1) the circuit court clearly erred in finding that trial counsel was not deficient for failing to secure a mistrial when undisclosed expert-opinion testimony was first revealed during trial in violation of the Arkansas rules of discovery; (2) the circuit court clearly erred in finding that trial counsel was not deficient for failure to secure admissible relevant evidence; (3) the circuit court clearly erred in finding that trial counsel was not deficient for failure to give effective assistance of counsel during plea negotiations; (4) trial counsel was ineffective based on the cumulative errors in the case; and (5) the circuit court abused its discretion in striking the testimony of Joyner's expert witness, Thomas Pavlinic. We affirm.

I. *Standard of Review*

"On appeal from a trial court's ruling on a petitioner's request for Rule 37 relief, this court will not reverse the trial court's decision granting or denying postconviction relief unless it is clearly erroneous. *Kemp v. State*, 347 Ark. 52, 55, 60 S.W.3d 404, 406 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id*." *Prater v. State*, 2012 Ark. 164, at 8, 402 S.W.3d 68, 74.

The benchmark for judging a claim of ineffective assistance of counsel must be "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland* [*v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)]." *Henington v. State*, 2012 Ark. 181, at 3–4, 403 S.W.3d 55, 58. Pursuant to *Strickland*, we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams v. State*, 369 Ark. 104, 251 S.W.3d 290 (2007). A petitioner making an ineffective-assistance-of-counsel claim must show that his counsel's performance fell below an objective standard of reasonableness. *Springs v. State*, 2012 Ark. 87, 387 S.W.3d 143. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

Second, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he was deprived of a fair trial. *Id*. The petitioner must show there

is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* Additionally, conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783; *Hinton v. State*, 2019 Ark. 136, at 7–8, 572 S.W.3d 381, 386–87.

"With respect to an ineffective-assistance-of-counsel claim regarding the decision of trial counsel to call a witness, such matters are generally trial strategy and outside the purview of Rule 37.1. *Banks v. State*, 2013 Ark. 147. When a petitioner alleges ineffective assistance of counsel for failure to call witnesses, it is incumbent on the petitioner to name the witness, provide a summary of the testimony, and establish that the testimony would have been admissible into evidence. *Wertz v. State*, 2014 Ark. 240, at 4, 434 S.W.3d 895, 900 (citing *Moten v. State*, 2013 Ark. 503 (per curiam)). To demonstrate prejudice, the petitioner is required to establish that there was a reasonable probability that, had counsel performed further investigation and presented the witness, the outcome of the trial would have been different. *Hickey v. State*, 2013 Ark. 237, 428 S.W.3d 446. Trial counsel must use his or her best judgment to determine which witnesses will be beneficial to the client. *Id.* Nonetheless, such strategic decisions must still be supported by reasonable professional judgment. *Id.* Finally, '[w]hen assessing an attorney's decision not to call a particular witness, it must be

taken into account that the decision is largely a matter of professional judgment which experienced advocates could endlessly debate, and the fact that there was a witness or witnesses that could have offered testimony beneficial to the defense is not in itself proof of counsel's ineffectiveness.' *Johnson v. State*, 325 Ark. 44, 49, 924 S.W.2d 233, 236 (1996) (internal citations omitted). To review the circuit court's order and correctly determine this issue, we must look at all the evidence adduced at trial and at the Rule 37 hearing. *Howard*, 367 Ark. 18, 238 S.W.3d 24." *Hinton*, 2019 Ark. 136, 8–9, 572 S.W.3d 381, 387–88 (alteration in the original).

In sum, the reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. The petitioner claiming ineffective assistance of counsel has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *See id*. Therefore, Joyner must first show that counsel's performance fell below an objective standard of reasonableness and then that counsel's errors actually had an adverse effect on the defense. *Id*. Joyner must satisfy both prongs of the test, and it is not necessary to determine whether counsel was deficient if Joyner fails to demonstrate prejudice as to an alleged error. *Kelley v. State*, 2011 Ark. 504.

II. *Points on Appeal*

A. Mistrial

For his first point on appeal, Joyner contends that the circuit court clearly erred in finding that trial counsel was not deficient for failing to secure a mistrial when undisclosed

expert-opinion testimony regarding DNA evidence was first revealed during the trial in violation of the Arkansas rules of discovery. Joyner asserts that he was prejudiced when counsel did not timely request a mistrial for what Joyner alleges was a discovery violation related to DNA evidence.

Pursuant to Rule 17.1 of the Arkansas Rules of Criminal Procedure, the prosecutor is required to disclose any report or statement of experts which is or may come within the possession, control, or knowledge of the prosecuting attorney. "With respect to motions for mistrial based on Arkansas Rule of Criminal Procedure 17.1, we have observed that a mistrial is an extreme sanction for a prosecutorial discovery violation and is to be avoided unless the fundamental fairness of the trial itself is at stake. *See Thompson v. State*, 322 Ark. 586, 589, 910 S.W.2d 694, 696 (1995)." *Maiden v. State*, 2014 Ark. 294, at 10, 438 S.W.3d 263, 271. Further, Rule 19.7 of the Arkansas Rules of Criminal Procedure provides for sanctions for failure to comply with appliable discovery rules, and states in pertinent part: "[T]he court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems proper under the circumstances." Ark. R. Crim. P. 19.7.

Here, at trial, the State's expert witness, Jennifer Beaty, a forensic DNA examiner with the Arkansas State Crime Laboratory, testified about DNA analysis from several items submitted to the lab, including three pairs of girls' underwear that were collected from S.O.'s bedroom. The DNA on the underwear was found to be a mixture from two individuals and identified as consistent with Joyner's and S.O.'s DNA. On direct

7

examination, while being questioned regarding the DNA associated with S.O., Beaty testified that an individual's DNA will be similar to related persons, but not identical to the individual's parents. Beaty explained that this is because half of an individual's DNA comes from the mother and half from the father; therefore, an individual's DNA would be similar to related individuals but not identical. Joyner's argument regarding Beaty's alleged new DNA testimony stems from Beaty's testimony concerning the DNA of related individuals. Beaty testified that S.O. would not have the same DNA as S.O.'s mother:

THE STATE:    So [S.O.'s] mother would she have the same DNA as [S.O.]?

BEATY:    No she wouldn't.

THE STATE:    . . . Can you tell me . . . what the likelihood of somebody else having the same DNA picture of [S.O.] is?

BEATY:    Well, from the underwear there was a major component that [S.O.] could not be excluded from. She's consistent with the major component. And from that you'd see that one in four point four six quadrillion people – in the Caucasian population you would of that many people maybe find one individual that could be excluded. So it'd be very rare.

. . .

THE STATE:    . . . Now a quadrillion, I'm not sure how many that is.

BEATY:    . . . It's a really large number. That's greater than a billion. Greater than trillion. . . it's many times the population [of this planet].

. . .

THE STATE:    All right. So . . . that's the likelihood that we'd find someone else that has the same DNA picture as [S.O.].

BEATY:    Right.

. . .

THE STATE: Now, [on the sample], . . . we've got [S.O.'s] DNA and we have . . . Joyner can't be excluded is that the way you say it?

DEFENSE
COUNSEL: I object to her saying [S.O.'s] DNA cause I don't think it's been identified as that. I think it's a mischaracteriz[ation] . . . to the Jury. I think she said it's consistent with it. She's not made an identification statement so the Prosecutor's continued to do that.

THE COURT: Okay. Would you rephrase please.

THE STATE: Please tell the jury, I don't want to misstate anything.

BEATY: The DNA identified . . . is consistent with [S.O.].

THE STATE: Okay. And – – and what are the statistics for the similarity there?

BEATY: . . . It's one in four point four six quadrillion.

THE STATE: Can you make an identity statement on one in four point four six quadrillion?

BEATY: I can but I didn't report it as that way.

THE STATE: . . . So is – – is that [S.O.'s] DNA?

BEATY: In my opinion yes.

The State goes on to ask Beaty approximately fifty additional questions regarding her report and the DNA results related to S.O. and Joyner, during which Joyner objects:

THE STATE: . . . So in conclusion the significant part of your findings are that we've got S.O.'s DNA . . . ?

DEFENSE
COUNSEL: Objection, that's not what she said. It's a mischaracterization again.

THE STATE: She made an identification statement.

| | |
|---|---|
| DEFENSE COUNSEL: | She said it was consistent. |
| THE STATE: | Can you make an identification statement? |
| BEATY: | I didn't report the identification statement. So it is consistent with [S.O.]. And the statistics that I just brought to . . . give you an idea of the likelihood that it's [S.O.'s] is one in four point four six quadrillion. |
| The State: | . . . So it's [S.O.'s] DNA, is that a fair statement to tell this jury? |
| Beaty: | It is consistent with [S.O.]. It basically is her DNA. |

Beaty went on to answer approximately three more questions and direct examination concluded at noon and the circuit court recessed for lunch. Prior to recess, the circuit court asked the attorneys if there was anything else to address and defense counsel responded, "Not at this time, Your Honor, not from the Defendant." When the trial reconvened, Joyner began his cross-examination of Beaty and after approximately a dozen questions regarding her report that the DNA profile she identified from the underwear was consistent with S.O.'s DNA, Beaty explained that she does not perform statistical analysis on items that originate from the victim:

> Since the underwear was submitted to me as victim's underwear I did not do statistics because if it came from the victim why do statistics. But I did, ah, calculate statistics in case.

Joyner moved for a mistrial, alleging that Beaty's testimony was new information and not disclosed to Joyner during discovery. Joyner alleged that Beaty had changed her opinion from what was in her disclosed report and had failed to provide her statistical analysis to Joyner. Joyner argued a mistrial was warranted, asserting that Beaty had disclosed only that the DNA was consistent with S.O.'s DNA rather than a match. The circuit court conducted

an in camera hearing where Beaty testified that, on her own, she had calculated the statistics the day before the trial and did not share them with the either the State or Joyner. Beaty further testified:

> [The calculations] were not new calculations. What it is is that we were submitted the victim's underwear. . . . If it's submitted to us as victim's underwear we usually do not do statistics on it . . . if it's consistent with the victim. Because if it's the victim's underwear it's known to be their underwear why do the statistics. And this is just to back up that this is consistent with her. And this – – this is her DNA.

Beaty reiterated her testimony in the in camera hearing and explained, she had not previously calculated the statistics for the report because "when something is removed from the victim we usually do not do statistics on it because if it comes back I mean this is the victim's DNA on this article of clothing that is known to be theirs." Further, Beaty testified she performed the calculations "to back up that this is consistent with [S.O.]." Beaty testified that the statistics came from the report both parties were given and that her opinion had never changed. The circuit court denied the motion for mistrial for two reasons: (1) the motion was untimely and (2) Beaty's entire file had been provided to Joyner.

At the Rule 37 hearing, Joyner's trial counsel, William O. James, testified he anticipated that Beaty's report stating that the DNA analysis was "consistent with" would be a "pretty high number." Based on this, James had represented to the jury in his opening statement that the State did not have an identification on the DNA. James further testified that at trial, Beaty's opinion changed from "it's probably this person to absolutely it's this person. And so, it's a big difference. And certainly part of the big problem in this case was, I was unaware that she had changed her opinion. . . . I am in the middle of trial and now all of a sudden I was completely wrong about what she was going to say. . . . My credibility

[with the jury was] gone." Further, James testified that he moved for a mistrial two or three questions into cross-examination when he realized that Beaty had changed her opinion.

The circuit court denied Joyner's claim for postconviction relief, finding:

> A careful reading of the trial record . . . reveals that trial counsel's only valid argument, was a discovery and evidentiary issue fully litigated in chambers (in camera) at trial. . . . Evidentiary and discovery objections were made and argued before the trial by Defendant's trial counsel and by the State on several issues.
> . . . .
>
> Defendant was supplied all materials by the Arkansas State Crime Laboratory. . . . Consequently, no prejudice can be established by the Defendant. . . .
>
> Moreover, the Defendant has failed to carry his burden of prejudice, i.e., that the decision of the jury regarding guilty would have been different. The defendant's trial counsel acknowledged that other evidence, in addition to the DNA evidence underlying this claim, would underlie his client's guilt. . . . In this case, where the victim testified, and where there was other overwhelming evidence of guilt for the jury to consider, the burden for the Defendant to show that the fact-finder would have a different outcome considering this claim solely is a significant and one that the Defendant cannot carry.

Joyner contends that the circuit court erred in failing to recognize that James's failure to move for a timely mistrial was deficient representation and James should have requested a continuance to discuss the new evidence with Joyner and reevaluate his cross-examination of Beaty. Joyner asserts he was prejudiced by this because Joyner would have received a new trial or he would have taken a plea, which demonstrates that a different result would have occurred. Joyner also contends that had James timely moved for a mistrial he would have received a new trial, or had James moved for sanctions pursuant to Rule 19.7 he would have entered a plea agreement. We note that Joyner develops much of his argument based

12

on opinions from Thomas Pavlinic. However, the circuit court struck Mr. Pavlinic's testimony.

On review, Joyner must first show that James made errors so serious that James was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams*, 369 Ark. 104, 251 S.W.3d 290. Joyner must show that James's performance fell below an objective standard of reasonableness. *Springs*, 2012 Ark. 87, 387 S.W.3d 143. We are unpersuaded that the circuit court erred in denying Joyner relief on this claim. Here, a thorough review of the record discussed above demonstrates that despite Joyner's argument, Joyner and the State retained the same report and information—the report provided to both parties stated that the match was 16 out of 16. Further, although Joyner argues that Beaty's testimony was changed or new, neither party was aware of the testimony that Joyner alleges was new—the calculations. And although Joyner argues that the degree of certainty changed and that Beaty's opinion was new, the record demonstrates that Beaty's testimony remained the same: the DNA on the underwear found in S.O.'s room was a strong match to S.O.'s DNA and consistent with S.O.'s DNA profile. Finally, we also note that other evidence supported the match to S.O., including S.O.'s own testimony. Based on our discussion above, a careful review of the record demonstrates that Joyner has failed to meet his burden under the first *Strickland* prong because he has not demonstrated that James's performance fell below an objective standard of reasonableness. In sum, because we conclude that the performance of Joyner's trial counsel was not deficient, we need not address the prejudice requirement, which is the

13

second prong under *Strickland*. *Williams v. State*, 2011 Ark. 489, 385 S.W.3d 228. Accordingly, we affirm the circuit court on this point.

## B. Rape Shield

For his second point on appeal, Joyner contends that the circuit court clearly erred in finding that Joyner did not receive ineffective assistance of counsel by James's alleged failure to secure admissible relevant evidence related to S.O.'s prior sexual conduct. With regard to a child-abuse victim's prior sexual conduct,

> [i]n [*State v.*] *Townsend*, [366 Ark. 152, 158, 233 S.W.3d 680, 685 (2006)], we recognized that evidence of a child victim's prior sexual conduct could be relevant to rebut the weighty inference that the victim must have received his or her knowledge of sexual matters from the alleged encounters with the defendant. We adopted a five-factor test from *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990), for determining whether evidence of a child victim's prior sexual conduct is admissible for the limited purpose of proving an alternative source for the child's sexual knowledge. For the evidence to be admissible, the defendant must offer proof
>
> > (1) that the prior act clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; (5) that the probative value of the evidence outweighs its prejudicial effect.

*Joyner*, 2009 Ark. 168, at 6, 303 S.W.3d at 58.

Immediately prior to trial, the circuit court held a rape-shield hearing wherein Joyner sought to introduce evidence of two instances of prior sexual conduct. The first event occurred in 2000, and the parties stipulated to the following: that S.O. was digitally penetrated in an assault that occurred in July 2000; that S.O. was taken to a social services agency at that time; and that S.O. would testify that she does not remember vaginal bleeding

14

after the assault in 2000. The record demonstrates that Joyner used this stipulation as an alternate source of injury to S.O.'s vaginal area.

The second instance of prior sexual conduct Joyner sought to introduce occurred in 2001 and is the one at issue in this appeal. The 2001 incident of alleged prior sexual conduct stems from alleged sexual abuse by Chuck McGhee. At the rape-shield hearing, Joyner called one witness, Tammy Mosley; submitted one affidavit from Mosley's minor daughter, D.D., and introduced CIP-Louisiana Child Services Reports for use at the in camera hearing. The circuit court denied Joyner's motion to introduce evidence of prior sexual conduct, finding that Joyner failed to offer proof that the prior alleged act did clearly occur and that the rape-shield statute precluded any inquiry into prior sexual conduct of S.O.

At the Rule 37 hearing, James testified that he did not attempt to get certified copies of the CIP-Louisiana Child Services Reports. James further testified that "any other prior allegations . . . and then certainly other causes for a possible reasons for what injury or physical evidence was found by [the State's witness] Dr. Jones, certainly would be good to deflect away from Mr. Joyner." James testified that if he had been able to get the documents introduced, he would have been able to cross-examine Dr. Jones about possible sources of S.O.'s vaginal injury. James also testified in the hearing that his performance in not getting the appropriate records admitted into evidence fell below the standards of care of an attorney in Arkansas. Further, James testified that the evidence would have been absolutely beneficial to Joyner's case. The circuit court denied Joyner's claim, finding that

> James admitted that he failed to obtain authenticated and/or certified copies of a CIP intake report. . . . The Defendant failed to establish the *Strickland* burden—enunciated in Arkansas . . . that there would have been a reasonable probability of a different outcome.

15

Further, in support of its burden, [Joyner] offers no proof of how such records would be authenticated, how such records would be offered into evidence, the substance of such-to-be-authenticated records, the proffered testimony regarding the substance of such records, or the qualifications or competence of any person or persons proposed to testify (which none have been proffered or simply named) about the substance contained in these records. Prejudice cannot be presumed in such circumstances with without more is self-serving, speculative, and conclusory . . . Arkansas courts have repeatedly, in the context of ineffective assistance of counsel cases, held that failing to call a witness or present evidence requires the petitioner, at the post-conviction stage to name the witness, summarize the testimony, and establish that the testimony would have been admissible. . . .The record at the evidentiary hearing is absolutely devoid of any such evidence. This court cannot grant post-conviction relief when the petitioner fails to show what the omitted testimony or evidence was and how it would have changed the outcome.

Joyner contends that the circuit court erred in denying his claim regarding the 2001 incident. Joyner asserts that if James had authenticated the documents, they would have been admissible. On this basis, Joyner argues that because of James's failure to produce admissible evidence, the jury did not hear 50 percent of the reliable evidence as to the potential source of the injury and did not hear evidence of penetration. Joyner alleges that admissibility of this evidence would have changed the outcome of the trial.

To prevail in this case, Joyner "must identify the witness, provide a summary of the testimony, and establish that the testimony would have been admissible into evidence. *Wertz v. State*, 2014 Ark. 240, at 4, 434 S.W.3d 895, 900 (citing *Moten v. State*, 2013 Ark. 503 (per curiam)). To demonstrate prejudice, Joyner is required to establish that there was a reasonable probability that, had counsel performed further investigation and presented the witness, the outcome of the trial would have been different. *Hickey v. State*, 2013 Ark. 237, 428 S.W.3d 446." *Hinton*, 2019 Ark. 136, at 8–9, 572 S.W.3d at 387.

16

Here, the record demonstrates that Joyner did not admit any documents into evidence at the Rule 37 hearing, address how the documents would be authenticated, explain how the documents would be admissible, or demonstrate how the contents of the report would be admissible. Accordingly, Joyner failed to demonstrate that his counsel was ineffective. Accordingly, we affirm the circuit court on this point.

## C. Plea Negotiations

For his third point on appeal, Joyner contends that the circuit court clearly erred in finding that Joyner's trial counsel was not ineffective for counsel's performance during plea negotiations. Joyner contends that his counsel was ineffective and he was prejudiced by having received a harsher sentence from the jury than either of the plea offers that his counsel failed to explain to Joyner.

With regard to plea offers and ineffective-assistance-of-counsel claims, "a bare assertion that a plea offer was made, standing alone, is insufficient to warrant relief based on an ineffective-assistance-of-counsel claim alleging that counsel failed to communicate the offer. *Huddleston v. State*, 347 Ark. 226, 230–31, 61 S.W.3d 163, 167–68 (2001) (per curiam) (citing *Scott v. State*, 286 Ark. 339, 691 S.W.2d 859 (1985) (per curiam))." *Robinson v. State*, 2016 Ark. 110, 4, 486 S.W.3d 201, 204–05. Further, in *Beavers v. State*, 2016 Ark. 277, at 1–2, 495 S.W.3d 76, 78, we explained our standard:

> In *Lafler v. Cooper*, 566 U.S. 156 (2012), the United States Supreme Court has stated as follows:
>
> Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process. *Frye, ante*, at 1386–1387, 132 S. Ct. 1399; see also *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1486, 176 L.Ed.2d 284 (2010); *Hill, supra*, at 57, 106 S. Ct. 366. During plea negotiations defendants are "entitled to the effective assistance of competent counsel."

*McMann v. Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed.2d 763 (1970).

*Lafler* squarely holds that defendants have a Sixth Amendment right to counsel, made applicable to this state by the Fourteenth Amendment, which extends to the plea–bargaining process.

The two-part *Strickland v. Washington*[, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] test applies here for claims based on ineffective assistance of counsel. *Lafler*, [566 U.S. at 162–63]. Under the performance prong of *Strickland*, a defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. at 163. To establish prejudice, a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *Id*. at 164.

Further, regarding parole eligibility, we have explained, "there is no constitutional requirement for defense counsel to inform his or her client about parole eligibility, and the failure to impart such information does not fall outside the range of competence demanded of attorneys in criminal cases. *Riddle v. State*, 2015 Ark. 72,; *Cummings v. State*, 2011 Ark. 410 (per curiam); *see also Buchheit v. State*, 339 Ark. 481, 6 S.W.3d 109 (1999) (per curiam); *Haywood v. State*, 288 Ark. 266, 704 S.W.2d 168 (1986)." *Hooks v. State*, 2015 Ark. 258, at 5–6, 465 S.W.3d 416, 420 (per curiam).

At the Rule 37 hearing, Joyner testified that on the eve of trial, James advised Joyner on the courthouse steps that the State was offering twenty years but did not explain anything past that. Joyner testified that he rejected the offer based on his understanding of the evidence at that time, which included that the DNA evidence was weak. Joyner further testified that after Beaty's DNA testimony that the sample was a match to S.O.'s DNA, James conveyed to Joyner that the State had extended another offer—twenty-five years.

Joyner testified that James told him he had five minutes to think about the offer and that James walked off without explaining any details regarding parole or time served. Joyner testified that he rejected the twenty-five-year offer because twenty-five years was too long for something he did not do. Joyner testified that had he known all the details; he would have accepted the twenty-five-year offer. In sum, Joyner testified that if he had known about the change in Beaty's DNA testimony and the parole eligibility, he would have accepted the plea offers.

Also at the Rule 37 hearing, on cross-examination, Joyner testified that the two offers were conveyed to him verbally by James—not by the State—and the offers were also not in writing. Joyner further testified that he wanted to go to trial and have a trial by a jury of his peers. Finally, Joyner testified he first raised his allegations about a plea offer or an enforceable agreement in his amended petition filed seven years after his original petition in 2010.

In its order denying the claim, the circuit court stated in pertinent part,

> Absolutely no evidence of an alleged plea agreement of any number of years, conditions, concessions, or other relief between Defendant and the State. No plea agreement was memorialized nor placed into the record by and between the State, the Defendant, or the Defendant's trial counsel. The Defendant's trial counsel testified that no such memorialization of proffer occurred. . . . The Defendant testified that no such memorialization was produced to him, known to him, nor did he participate in any such proffer. . . . . The first discussion, mention, or appearance of an alleged plea offer by the Defendant in its Amended Petition filed in 2017, years following his arrest and conviction. . . . The Defendant filed no such claim for relief in the Original Petition.

> Assuming arguendo that such offers were made as contended by the Defendant . . . overwhelming evidence points towards the Defendant rejecting all offers and insisting on taking his case to a jury trial.

Furthermore—and still assuming arguendo the existence of an offer—the plea offer's rejection/withdrawal was the result of the Defendant's trial commencing or resuming. . . , and not upon any alleged delayed or non-communication of the Defendant's trial counsel. Such facts, if true, as insufficient to warrant relief. . . . the court FINDS that no plea agreement existed . . . alternatively, the court FINDS that if such plea agreements existed, no such evidence is before this Court and the Defendant has failed to meet his burden that he would have accepted such offers so extended to him.

Here, Joyner contends that the circuit court clearly erred, arguing that because James failed to educate Joyner appropriately or secure enough time for Joyner to consider the offers, James's representation fell below the standard of care. Joyner contends that he was clearly prejudiced by this as the sentence he received far exceeded the offers. The State responds that Joyner failed to prove the existence of a plea agreement, and despite the alleged offers, Joyner testified at the Rule 37 hearing that he would not have accepted either offer because he is innocent. Joyner replies that the record shows that his counsel's performance was deficient because he failed to explain the plea offers and parole eligibility, which clearly prejudiced Joyner since he received a forty-year sentence.

On review, we are unpersuaded by Joyner's argument. The record does not support the existence of a plea offer or an enforceable agreement. Further, if there was an agreement, Joyner has failed to demonstrate a connection between his rejection of an offer and his counsel's ineffectiveness. Joyner repeatedly testified that he was not interested in accepting an offer of a term of years for something he did not do. For the reasons discussed above, we do not find merit in Joyner's claims regarding plea offers and parole eligibility. Joyner has failed to meet his burden under the first *Strickland* prong because he has not demonstrated that his trial counsel's performance fell below an objective standard of reasonableness. In sum, because we conclude that the performance of Joyner's trial counsel was not deficient,

20

we need not address the prejudice requirement, which is the second prong under *Strickland*. *Williams*, 2011 Ark. 489, 385 S.W.3d 228. Accordingly, we affirm the circuit court on this point.

## D. Cumulative Errors

For his fourth point on appeal, Joyner contends that trial counsel was ineffective based on the cumulative errors in his case and that he was prejudiced. The circuit court found that "cumulative error is not recognized by Arkansas courts or by the Eighth Circuit . . . [Joyner] asserts no good-faith basis in his Amended Petition for recognizing cumulative errors in this case in contradiction of well-settled law."

On appeal, while Joyner recognizes that Arkansas does not recognize cumulative errors in ineffectiveness claims, he urges this court to recognize the claim. Further, Joyner contends that in *Flores v. State*, 350 Ark. 198, 212, 85 S.W.3d 896, 905 (2002), the court applied a cumulative-error analysis in an ineffectiveness claim. Finally, Joyner argues his case is the "perfect example of why cumulative error should be applied." The State responds that Arkansas does not recognize cumulative error of trial counsel and the facts of Joyner's case do not merit reconsideration of this long-standing principle. We agree.

Despite Joyner's allegations regarding *Flores*, we have not recognized cumulative error. We explained that "[t]rial counsel's abdication of his duties as counsel for Flores is demonstrated by his many errors both pretrial and during the trial. However, this court does not recognize cumulative error. *Huddleston v. State*, 339 Ark. 266, 5 S.W.3d 46 (1999)." *Flores*, 350 Ark. at 212, 85 S.W.3d at 905. Further, we decline the invitation to overrule our precedent. Accordingly, we affirm on this point.

21

E. Joyner's Expert Witness: Thomas Pavlinic

For his final point on appeal, Joyner contends that the circuit court abused its discretion in striking the testimony of Joyner's expert witness, Annapolis, Maryland, criminal-defense attorney, Thomas Pavlinic. At the Rule 37 hearing, the circuit court allowed Pavlinic to testify, and the State moved to strike Pavlinic's testimony; the circuit court ruled it would "give it what weight I think that it's entitled to"; and in its February 6, 2020 order granted the State's motion to strike.

With regard to expert witnesses, we have explained that "[i]f some reasonable basis exists demonstrating that a witness has knowledge of the subject beyond that of ordinary knowledge, the evidence may be admissible as expert testimony under Arkansas Rule of Evidence 702. *See Flowers v. State*, 373 Ark. 127, 133, 282 S.W.3d 767, 772 (2008) (quoting *Flowers v. State*, 362 Ark. 193, 210, 208 S.W.3d 113, 127 (2005)). The decision of a circuit court to admit or exclude expert testimony is reviewed on an abuse of discretion standard. *See Vance v. State*, 2011 Ark. 243, at 27." *Gordon v. State*, 2012 Ark. 398, at 6. "The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue. *See* Ark. R. Evid. 702 (2011); *see also Buford*, *supra*. An important consideration in determining whether the testimony will aid the trier of fact is whether the situation is beyond the ability of the trier of fact to understand and draw its own conclusions. *See Buford*, *supra*." *Laswell v. State*, 2012 Ark. 201, at 17, 404 S.W.3d 818, 828–29.

Here, Joyner sought to have Pavlinic testify as an expert witness to opine on *Strickland* ineffective-assistance-of-counsel claims. The circuit court excluded Pavlinic's testimony, finding that

> [t]he admission of the opinion expert testimony of . . . Pavlinic . . . invades the province of this court to understand or draw its own conclusion about the law governing this matter. . . . Pavlinic does not possess the qualifications to expound on the standards and customs of practice in Arkansas. . . . He is not an admitted Arkansas attorney in good standing with the Arkansas Supreme Court. . . . The sum-total of Pavlinic's experience with the Arkansas criminal justice system is the case-at-bar and one other. . . . Pavlinic did not perform any roles as post-conviction counsel in this case. . . . In preparation for the [Rule 37] hearing, Pavlinic read, consulted, studied, and examined one (1) Arkansas case with regards to Arkansas ineffective of assistance law. . . . In preparation for the [Rule 37] hearing, Pavlinic did not read, consult, study, or examine the Arkansas Criminal Code. . . . In preparation for the [Rule 37] hearing, Pavlinic stated that he had spent a sum-total of "fifteen minutes" reading Ark. R. Crim. P. 37.1. . . . In preparation for the [Rule 37] hearing, Pavlinic was unfamiliar with the annotations to Ark. R. Crim. P. 37.1. . . . In preparation for the [Rule 37] hearing, Pavlinic did not read, study, consult or examine any Arkansas cases relating to ineffective assistance of counsel connected to plea bargains.
>
> . . . .
>
> [T]his Court finds that simply accepting him as an expert in this case and deferring to his opinions as to whether the conduct of the Defendant's trail attorney fell below the standard of care would be an abdication of this Court's responsibilities. The Court GRANTS the State's objection to the testimony of . . . Pavlinic and his expert qualification pursuant to Ark. R. Evid. 702. The court concludes that the testimony of . . . Pavlinic . . . is hereby EXCLUDED and STRICKEN from the record.

Joyner contends that the circuit court erred in excluding Pavlinic's testimony, asserting that Pavlinic's claims are soundly within the *Strickland* standard, and striking his testimony because he had not reviewed a few articles on Arkansas procedure that were not critical to the *Strickland* standard is error.

Joyner further contends that Pavlinic's claims were all soundly within *Strickland* and that there "there could be nothing in Arkansas law that . . . Pavlinic was not aware of that could limit . . . Joyner's Sixth Amendment rights under the federal constitution." We note that Joyner makes conclusory arguments without citation to authority. Further, based on the record before us, we are not persuaded that the circuit court erred in excluding Pavlinic's testimony. Accordingly, we affirm the circuit court.

Affirmed.

Special Justice ROBERT BYNUM GIBSON III joins in this opinion.

KEMP, C.J., not participating.

*The Seddiq Law Firm*, by: *Justin Eisele*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.